UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

ALBERTO ROJAS,

                                        Plaintiff,

                    -against-                                    **COMPLAINT**

                                                                 **JURY DEMAND**

LNK INTERNATIONAL, INC, and JOSEPH J MOLLICA
II,

                                        Defendants.

------------------------------------------------------------------------X

## JURISDICTION AND VENUE

1.  This action arises from violations of the Americans with Disabilities Act of 1990(ADA), Title VII of the Civil Rights Act of 1964 ("TITLE VII"), Family and Medical Leave Act ("FMLA").

2.  This Court has original jurisdiction under 28 U.S.C. §1331. Federal Question, in relation to Plaintiff´s claims as these claims arise under the laws of the United States.

3.  Supplemental jurisdiction is invoked under 28 U.S.C. § 1367 for Plaintiff's claims under the New York Labor Law ("NYLL"), New York City Human Rights Law ("NYCHRL"), U.S. Code (U.S.C), and the Title 8 of the Administrative Code of the City of New York, as these claims form part of the same case or controversy.

4.  Venue is proper in the United States District Court of New York pursuant to 28 U.S.C. §1391, as Defendants conduct business in New York County, and a substantial part of the events or omissions giving rise to the claim occurred in New York, New York.

## THE PARTIES

### PLAINTIFF

5.  Plaintiff ALBERTO ROJAS hereinafter ("Plaintiff") or ("Plaintiff Rojas") or ("Mr. Rojas") resides at 1070 Ferndale Boulevard, Central Isle, NY, 11722.

### DEFENDANTS

6.  Defendant, LNK INTERNATIONAL, INC. hereinafter ("Defendant LNK International") or ("LNK International") is a corporation conducting business in the State of New York at 333 22 Arkay Dr, Hauppauge, NY 11788.

7. Defendant LNK International performed one or more of the following actions while Plaintiff worked for Defendant: (1) hire the Plaintiff, (2) terminate the employment of the Plaintiff, (3) set the wage rate of Plaintiff, (4) maintain payroll records concerning the Plaintiff, or (5) institute work rules for the Plaintiff.

8. Defendant, JOSEPH J MOLLICA II (Defendant Mollica) or (Mr. Mollica) acts as the CEO of Defendant LNK International.

9. Defendant Mollica performed one or more of the following actions while Plaintiff worked for Defendant: (1) hire the Plaintiff, (2) terminate the employment of the Plaintiff, (3) set the wage rate of Plaintiff, (4) maintain payroll records concerning the Plaintiff, or (5) institute work rules for the Plaintiff.

10. Defendant LNK International and Defendant Mollica will hereby be referred to jointly as ("Defendants") unless otherwise noted.

## BACKGROUND FACTS

11. Defendant LNK International, founded in 1980, specializes in producing over-the-counter pharmaceuticals. The company handles every aspect of production, from raw material acquisition to distribution, ensuring full control over quality.

12. On April 8, 2021, Defendants employed Plaintiff Rojas as a W2 non-exempt wage earner.

13. Plaintiff, Rojas, was hired by Defendants as a Machine Helper in the Coating Machine area, where pills undergo the coating process.

14. In this role, Mr. Rojas' responsibilities included lifting and organizing pillboxes, ensuring that the pills were properly coated, and maintaining cleanliness in the designated work area.

15. Plaintiff Rojas stopped working for the Defendant on December 7, 2023.

16. At all relevant times, Defendant employed over 50 employees.

17. Plaintiff Rojas never had the power to hire or fire employees, control employee work hours, or otherwise control other employee work conditions.

18. Plaintiff received a right-to-sue letter from the EEOC on December 11, 2024. **(Ex. 1 2024.12.11 _EEOC Right to Sue_)**

## FMLA DENIAL AND FAILURE TO ACCOMMODATE FACTS

19. Plaintiff Rojas reported directly to his supervisor, Narpinder Singh (a/k/a "Nanu"), and also received instructions from Michael, Nanu's assistant.

20. Nanu spoke only English, while Michael, a native of El Salvador, was bilingual in English and Spanish. Due to the language barrier, Michael frequently acted as an interpreter between Nanu and Spanish-speaking employees, including Plaintiff.

21. Plaintiff Rojas, a native of Colombia, was not fluent in English at the time of his employment. While he understood basic job-related terms, he relied on Spanish-speaking colleagues for effective workplace communication.

22. Plaintiff and his coworkers worked in a warehouse setting where their job duties did not involve direct customer interaction. Their limited English proficiency did not impact their work performance or cause any delays, as their supervisors had bilingual colleagues who were fluent in both Spanish and English and assisted with translation, ensuring effective communication.

23. Despite this, Plaintiff and his coworkers were unfairly singled out and subjected to discriminatory remarks regarding their language abilities. When they objected, they emphasized their strong work ethic and demonstrated that they were fully capable of performing their duties efficiently without issue.

24. In early May 2023, Plaintiff began experiencing severe and persistent back pain.

25. Concerned about his worsening condition, Plaintiff sought medical attention from Dr. Brian Golden ("Dr. Golden"), a specialist in Physical Medicine and Rehabilitation.

26. Following the consultation, Dr. Golden ordered diagnostic imaging to determine the cause of Plaintiff's pain.

27. On May 23, 2023, Plaintiff received MRI and X-ray results confirming a spinal deviation and a herniated disc, conditions that caused significant pain in his back, hips, and right leg.



Figure 1 Figure 1: Mr. Rojas' X-Ray Confirming Spinal Deviation and Herniated Disc.

28. Plaintiff's medical condition caused persistent pain in his back, hips, and right leg, significantly impacting his daily life. After work, he struggled to stand up, had difficulty sleeping, avoided walking long distances, and was unable to perform basic household chores such as taking out the garbage, cleaning the bathroom, grocery shopping, or carrying heavy bags.

29. To manage the pain, Plaintiff underwent physical therapy and received pain-relief injections.

30. Despite his worsening condition, Plaintiff made every effort to fulfill his job responsibilities without interruption or complaint.

31. Plaintiff's job at Defendant's facility required him to perform strenuous physical labor daily. He was assigned to assemble pallets loaded with heavy boxes of pills, each weighing between 33 and 34 pounds, per strict management directives.

32. Each pallet contained 36 boxes, stacked in multiple layers, requiring Plaintiff to lift, carry, and arrange approximately 1,210 pounds per pallet.

33. Plaintiff was required to repeat this physically grueling process between 15 and 17 times per shift, meaning he manually lifted and transported over 19,000 pounds of weight each workday.

34. Defendants failed to provide any tools, mechanical assistance, or reasonable accommodations to ease the burden of this physically demanding labor. Plaintiff was forced to lift and carry every box manually, without support from equipment or additional staff, despite his worsening medical condition.



Figure 2 Pallet of Boxes Mr. Rojas had to carry.

35. On July 14, 2023, as his pain worsened, Plaintiff Rojas sought medical documentation from Dr. Golden to formally request reasonable workplace accommodations, specifically to prevent him from continuing to lift excessive weight.

36. Dr. Golden's letter explicitly stated that Plaintiff should not lift more than 10 pounds at a time—a restriction that was blatantly incompatible with his job duties, which required lifting boxes weighing over three times that amount. (Ex.2 2023.07.14_Doctors request for accommodations_)



Figure 3. Doctors request for accommodations

37. Later that day, when Mr. Rojas arrived at work around 4:00 PM, he approached Michael, the assistant supervisor, and handed him Dr. Golden's letter, which detailed his medical condition and need for workplace accommodations.

38. Plaintiff explicitly asked Michael to deliver the letter to Supervisor Nanu and explain its contents, ensuring that management was fully informed of his serious medical limitations.

39. Shortly after, Nanu summoned Plaintiff Rojas to his office, located approximately 40 meters away. When Rojas arrived, Michael was present to interpret, confirming that Defendants were well aware of Plaintiff's limited English proficiency. Nanu requested a copy of the doctor's letter and briefly inquired about its contents.

40. Without any discussion or attempt to accommodate Plaintiff's medical needs, Nanu immediately ordered him to clock out and report to Human Resources—effectively removing him from his job the moment he disclosed his disability.

41. Following this abrupt instruction, Plaintiff complied and went to the Human Resources office, which was in another building. He specifically sought out Ms. Janet Rojas ("Ms. Janet"), the Human Resources representative, who, like Plaintiff, was Colombian and spoke Spanish—further demonstrating that Defendants were aware of Plaintiff's language barrier.

42. During the meeting, rather than addressing Plaintiff's medical condition or his request for accommodation, Ms. Janet interrogated him about his previous jobs in Colombia and what other tasks he could perform, suggesting that his options would be extremely limited.

43. Despite Plaintiff clearly expressing his willingness to continue working in a role that accommodated his medical restrictions, Ms. Janet made no genuine effort to explore any alternatives within the company.

44. Instead of offering an accommodation, training for a less strenuous role, or modifications to his duties, Ms. Janet dismissively handed Plaintiff the company's FMLA (Family and Medical Leave Act) paperwork, entirely in English, without providing any explanation or assistance.

45. Ms. Janet then abruptly ended the conversation stating that "Cuando te sientas mejor, puedes volver al trabajo, pero no vas a regresar al mismo departamento, te lo aseguro. Vamos a intentar buscar otra posición para ti porque actualmente no hay vacantes disponibles." (which translates to: "When you feel better, you can return to work, but you will not be going back to the same department, I assure you. We will try to find another position for you, but currently, there are no vacancies available.")

46. Defendants effectively left Plaintiff in limbo, providing no concrete information about his job status, failing to offer any reasonable accommodation, and refusing to engage in the legally required interactive process under the ADA.

47. Ms. Janet then sent Plaintiff home without further instructions, without explaining how to complete the FMLA forms, and without any clear guidance on what steps he needed to take next, deliberately obstructing his ability to exercise his rights.

48. On July 18, 2024, struggling with persistent pain and desperate to resolve his employment situation, Plaintiff visited Dr. Golden's office to seek both treatment and assistance with the FMLA paperwork. However, he was informed that his first available treatment appointment was too far away, forcing him to seek another specialist.

49. On July 19, 2024, Plaintiff returned to Dr. Golden's office, only to be informed that the FMLA documents had been lost, yet another delay that compounded his difficulties.

50. Throughout the rest of July, Plaintiff made repeated, urgent attempts to obtain new FMLA paperwork from the Human Resources department. Despite his persistence, Defendants ignored his phone calls, particularly Ms. Janet and Ms. Angie Munante (hereinafter "Ms. Munante"), another Spanish-speaking HR representative. Defendants' failure to respond prolonged Plaintiff's forced absence from work and deprived him of his income.

51. As weeks passed with no response, Plaintiff had no choice but to ask his son, who also worked for the company, to physically go to HR and speak with Ms. Janet or Ms. Angie in person. Only then did HR begrudgingly provide the FMLA forms again, along with the specialist's paperwork required by ShelterPoint, the insurance company responsible for covering Plaintiff's lost wages.

52. Determined to comply despite Defendants' stonewalling, Plaintiff promptly went to his primary care physician, Dr. Ambr Hassan, to have the FMLA forms completed. He also consulted with specialist Dr. Luis Fandos to complete the additional disability paperwork required for his insurance claim.

53. On August 20, 2024, Plaintiff returned to the company's facilities and personally handed the completed FMLA forms and incapacity documentation to Ms. Munante. When he inquired about when he could return to work, Ms. Munante imposed yet another obstacle, demanding that he provide a separate letter from his doctor stating he was cleared to return to work—despite the fact that his original paperwork should have been sufficient.

54. On September 21, 2023, Plaintiff Rojas personally delivered a letter from Dr. Luis Fandos to Ms. Munante, confirming that he was medically cleared to return to work. Without any discussion or review of possible accommodations, Ms. Munante immediately informed him that he could return to work that same day—entirely disregarding his documented medical restrictions.

55. Upon returning to work, Plaintiff was shocked to discover that he had been reassigned to the same physically demanding department—directly contradicting Ms. Janet's earlier assurances that he would be placed in a less strenuous role. During the shift briefing, Michael, Supervisor Nanu's assistant, assigned Plaintiff to the polish machine, claiming this position involved lighter duties. However, despite this claim, the core physical demands remained unchanged. Plaintiff was still required to handle approximately 7 pallets per day, each containing 36 boxes weighing 35 pounds each—blatantly disregarding his doctor's strict recommendation that he should not lift more than 10 pounds.

56. Defendants' lack of concern for Plaintiff's health escalated further when, within an hour, Supervisor Nanu overruled Michael's assignment and ordered Plaintiff back to the more physically grueling coating machine, fully aware of Plaintiff's medical condition. Nanu's rationale was that Plaintiff was already familiar with the machine's operation, prioritizing convenience over Plaintiff's well-being.

57. Fearing retaliation, Plaintiff felt powerless to object. Although he was deeply distressed by this reassignment and had held out hope for a reasonable accommodation, he remained silent, especially given that Ms. Janet from Human Resources had previously told him there were no alternative positions available.

58. On October 5, 2023, after enduring relentless pain and worsening symptoms, Plaintiff could no longer tolerate his deteriorating condition and desperately sought out Supervisor Nanu for a meeting. With Michael present as an interpreter, Plaintiff explicitly explained that the pain in his back had become unbearable and was severely impacting his daily life.

59. In a clear and reasonable request, Plaintiff pleaded for a transfer to a less physically demanding role, such as driving small vehicles or working in the warehouse, both of which would allow him to remain employed without further injury.

60. Rather than engaging in the required interactive process, Supervisor Nanu coldly dismissed Plaintiff's request without any consideration or discussion. He flatly refused to explore accommodations and instead ordered Plaintiff to continue working under the same excruciating conditions, knowingly subjecting him to severe pain and physical distress.

61. On October 15, 2023, Plaintiff's suffering was evident as he confided in his coworkers, Vicente and Juan Carlos Moncada ("Mr. Moncada"), about the persistent pain in his leg and the desperate measures he was taking to cope with it. Plaintiff, in visible discomfort, described how his condition had worsened due to Defendants' failure to accommodate his disability.

62. During this conversation, Supervisor Nanu arrived. Although Nanu does not speak fluent Spanish, Nanu understand that the discussion was about Plaintiff Rojas' leg pain, as Vicente translated and explained the subject to him.

63. Following this, Nanu acted without regard to Mr. Rojas wellbeing. He humiliated him in front of Vicente and Mr. Moncada for been complaining about his leg making a gesture towards Plaintiff Rojas, mimicking scissors with his hands and then pointing to Rojas' leg. He yelled trying to get everyone's attention and mocking Plaintiff Rojas suggesting that Plaintiff Rojas' leg should be cut off. He encouraged the staff to laugh at him and belittle her for his own personal amusement.

64. In response, Plaintiff Rojas limits gestures back, saying "no, no," and signaling to Nanu not to make such comments.

65. Plaintiff Rojas felt singled out and deeply humiliated as his coworkers laughed at his pain, encouraged by Nanu's cruel mockery. The comments and gestures directed at him were unwelcome, degrading, and intended to embarrass him in front of his colleagues. Rather than fostering a professional and respectful work environment, Nanu deliberately turned Plaintiff's suffering into a joke, creating an atmosphere of ridicule and hostility. The fact that his pain was dismissed as entertainment made the situation even more distressing, leaving Plaintiff feeling isolated, disrespected, and powerless to defend himself.

66. On November 13, 2023, Mr. Rojas asked Nanu if they could talk privately. Nanu called him into his office with Michael so they can understand each other. In the conversation, Plaintiff Rojas again inquired about his need for accommodation, to which Nanu replied, "The company would not be responsible for your health." Nanu replied, "Please, clock out immediately," which Plaintiff Rojas did.

67. On November 14, 2023, Plaintiff Rojas visited Ms. Munante from Human Resources, only to be sent home once again without the FMLA form and without the disability from the insurance company. He also did not receive any assistance or payment. No further information was provided to Mr. Rojas. In Ms. Munante's own words, "vaya a la casa y nosotros lo llamamos" (which translates to: "Go home, and we will call you back").

68. Mr. Rojas returned home once again, hoping to eventually receive the requested accommodation.

69. On December 6, 2023, Ms. Munante called Plaintiff Rojas on the phone, claiming they had found an "accommodation" for him. The new role required him to stand all day because his duties were assembling the pills.

70. The new role intensified Plaintiff Rojas's pain to an unbearable level because he had to remain standing throughout the entire workday, which put pressure on his hernia. As a result, he experienced severe pain in his back and right leg.

71. On December 8, 2023, Plaintiff Rojas returned to Human Resources only to be told by Ms. Munante that no other positions were available. He was given an ultimatum: "Either you accept the new role to you or resign, but to stay, you would need to fill out more paperwork with your doctor stating that you could not stand all day." That day, Angie gave him another FMLA form and send sent him home again. At the end of the conversation, Angie asked him: so, are you going to resign?" Mr. Rojas denies it.

72. When Mr. Rojas arrived home, he realized that the FMLA form was entirely in English, a language he did not fully understand. Knowing from prior experience that he would struggle to complete the paperwork without assistance, he immediately recognized that Defendants had once again placed him in an impossible position. Despite this, Plaintiff did his best to complete the FMLA documents. During this time, he received no income from Defendants, leaving him financially vulnerable and unable to support himself. (Ex. 3 2023.12.08_FMLA Application)

73. In early January 2024, still desperate to return to work, Plaintiff contacted Human Resources by phone, hoping to move the FMLA process forward. He attempted to submit the FMLA paperwork, even without the accompanying disability document required by the insurance company, in an effort to comply as best he could. Defendants ignored his calls. No one informed him of any deadlines, provided him with assistance, or even acknowledged his efforts to complete the process. As a result, Plaintiff remained in limbo, receiving no guidance, no support, and no income.

74. On February 27, 2024, after months of silence and neglect from Defendants, Plaintiff was forced to visit the company's offices in person, still seeking answers.

75. Upon his arrival, he was informed that Ms. Janet, one of the only HR employees who spoke Spanish, was no longer employed at the company. Instead, a new representative, Jennifer, had taken over her role. While Jennifer also spoke Spanish, her response to Plaintiff's concerns was even more dismissive than those of her predecessor. She coldly informed Plaintiff that the company could no longer assist him, claiming too much time had passed and blaming him for failing to submit the required FMLA documents, despite the fact that Defendants had never informed him of any deadlines or provided any assistance.

76. Plaintiff immediately objected, pointing out that he had never been told of any specific deadlines for submitting the paperwork. He further explained that he had repeatedly sought assistance from Human Resources, had called multiple times without a response, and had been ignored at every turn.

77. Plaintiff also explained that delays from his own doctor further complicated the process, yet he had continued trying to comply. At no point did Defendants offer flexibility or reasonable assistance despite knowing Plaintiff was struggling due to both his medical condition and language barrier.

78. Jennifer, however, refused to acknowledge any wrongdoing by the company. Instead, she blamed Plaintiff entirely, dismissively stating that it was his fault the required forms had not been submitted on time. When Plaintiff pleaded with her for understanding, explaining in Spanish that he had repeatedly called, had been ignored, and that HR was fully aware that he did not speak English or understand the forms, Jennifer remained indifferent. She simply reiterated that the company would not help him and that nothing could be done.

79. While Plaintiff was still speaking, Jennifer coldly turned away from him and stared at her computer screen, blatantly ignoring him. Without offering any alternative solutions, she flatly stated, "Lo siento, no hay nada que pueda hacer" (wich translates to: "I'm sorry, there's nothing I can do"). Rather than assisting Plaintiff with his FMLA process, Defendants abandoned him. The only thing Plaintiff received from this meeting was the disability form that needed to be sent to ShelterPoint so he could at least receive some compensation, something Defendants should have provided long before.

80. On February 29, 2024, still seeking clarity about his employment status, Plaintiff called Jennifer in Human Resources and requested an employment letter. Jennifer gave no explanation or details but simply instructed him to come to the company to pick it up, withholding any further information.

81. Later that day, around 3:30 PM, Plaintiff Rojas went directly to the Human Resources office, still unaware of his employment status. Upon his arrival, Jennifer handed him a letter without explanation. The letter, signed by Madelin Villanueva, the Payroll Administrator, coldly informed him that his employment had officially ended on January 24, 2024, more than a month earlier. Defendants had deliberately kept Plaintiff in the dark about his termination, failing to notify him in a timely manner and ensuring that he remained uncertain about his job status for weeks. (Ex. 4_2024.02.29_Termination letter)

82. Confused and blindsided, Plaintiff Rojas took the letter and left the premises, still unable to fully comprehend why or when Defendants had decided to terminate him. He had received no warnings, no prior notice, and no opportunity to appeal the decision.

83. On April 8, 2024, struggling to survive without income, Plaintiff Rojas was forced to apply for state unemployment benefits due to his ongoing medical condition. His inability to work was a direct result of the physical strain Defendants had subjected him to, and his medical needs continued to limit his employment options.

84. On July 2, 2024, Plaintiff received yet another blow. The Department of Labor denied his unemployment benefits based on false and misleading statements from Defendants. Defendants falsely alleged that Plaintiff was terminated for "misconduct," specifically claiming: "You were discharged because you did not provide FMLA documentation on time. You returned the paperwork to the employer. This is not the first time you had to complete and

return FMLA documentation. Therefore, you knew or should have known that your actions would jeopardize your job."

85. Defendants' statements were outright misrepresentations designed to shift blame onto Plaintiff and cover up their failure to accommodate his disability. In reality, Plaintiff had made multiple attempts to comply with the FMLA process, only to be met with deliberate delays, ignored phone calls, and a complete lack of assistance from Defendants' Human Resources department. Despite Plaintiff's repeated efforts to seek clarification, Defendants obstructed the process at every turn, ensuring that Plaintiff would miss deadlines they never even communicated to him.

86. At no point was Plaintiff informed of any specific deadlines for submitting the FMLA paperwork. His repeated attempts to contact Human Resources—through phone calls and in-person visits—were ignored or met with vague, dismissive responses. Defendants' claim that Plaintiff "knew or should have known" the deadlines was a blatant fabrication intended to justify their discriminatory actions. (Ex. 5 2024.07.02_Response of the DOL about the unemployment benefits)

87. Rather than fulfilling their legal obligation to engage in the interactive process and provide a reasonable accommodation, Defendants placed the entire burden on Plaintiff—who was already suffering from a serious medical condition. They knowingly refused to assist him, failed to provide the accommodations necessary for him to continue working, and then fabricated a pretext for his termination.

88. The claim that Plaintiff was terminated due to "misconduct" was a baseless excuse. Plaintiff had never received any disciplinary warnings or indications of poor performance. Instead, Defendants used his disability as a justification for his termination, punishing him for requesting the accommodations he was legally entitled to receive.

## DISCRIMINATORY TREATMENT AND HOSTILE WORK ENVIRONMENT BASED ON NATIONAL ORIGIN

89. On or about October 30, 2023, during the night shift, Plaintiff Rojas was working near one of the coating machines alongside his coworkers, Vicente and Juan Carlos Moncada. While performing his duties, Plaintiff heard an unusual noise coming from the machine. Concerned that there might be a malfunction, he turned on his phone's flashlight to inspect the issue and discovered that a bristle from the cleaning brush had become lodged inside the machine. Recognizing the potential risk of contamination or equipment failure, Plaintiff promptly called Lilian, an operator, to assess the situation.

90. Once Lilian arrived, Plaintiff and his coworkers took immediate action to prevent further complications. Together, they decided that the best way to remove the bristle was to lift

Plaintiff so he could enter the machine and extract the obstruction. Their actions demonstrated initiative and a commitment to maintaining workplace safety and efficiency.

91. However, when Supervisor Nanu arrived a few minutes later, he did not commend Plaintiff for his diligence or express concern about the equipment issue. Instead, he singled out Plaintiff based on his Colombian nationality and made an offensive, discriminatory remark. In front of multiple employees, Nanu turned to Lilian and, in English, stated, "That's how he used to work with Pablo Escobar in Colombia."

92. This comment was a clear ethnic stereotype, falsely associating Plaintiff's nationality with criminal activity. It was meant to degrade and humiliate Plaintiff in front of his colleagues, reinforcing a hostile work environment rooted in national origin discrimination.

93. Deeply offended, Plaintiff immediately asked Lilian to translate what Nanu had just said. When Lilian relayed the comment in Spanish, Plaintiff firmly objected and told her to inform Nanu that his statement was false and highly inappropriate. Rather than apologizing or acknowledging his misconduct, Nanu dismissed the matter, and the conversation ended.

94. This was not an isolated incident but part of a broader pattern of discriminatory treatment by Defendant LNK International. Defendants demonstrated a blatant disregard for employees of non-U.S. origin, as evidenced by their treatment of Plaintiff Rojas. They not only subjected him to derogatory comments about his nationality but also failed to provide essential employment-related documents in his native language, deliberately withholding assistance despite knowing that he struggled with English.

95. Despite being required by the U.S. Department of Justice to provide anti-discrimination training and awareness programs for its employees, Defendants failed to foster a workplace free from discrimination. Under the terms of a prior settlement agreement, LNK International was obligated to pay a $220,000 civil penalty, conduct training on the anti-discrimination provisions of the Immigration and Nationality Act (INA), and undergo a three-year monitoring period to ensure compliance. However, rather than implementing meaningful changes, Defendants continued to engage in discriminatory practices, as evidenced by the hostile work environment and mistreatment Plaintiff Rojas experienced.[1]

96. Even if such training sessions were conducted as required by the settlement agreement, they were clearly insufficient to properly educate and sensitize employees on anti-discrimination laws. Defendants' workforce continued to degrade and mistreat Hispanic employees,

---

[1] U.S. Department of Justice. (n.d.). *Justice Department settles with New York-based pharmaceutical manufacturing company to resolve allegations.* U.S. Department of Justice Archives. Retrieved February 28, 2025, from https://www.justice.gov/archives/opa/pr/justice-department-settles-new-york-based-pharmaceutical-manufacturing-company-resolve

demonstrating that any training provided was either inadequate, ineffective, or entirely disregarded in practice.



Figure 4 DOJ Fines LNK International $220,000 for Discriminatory Hiring Practices

97. This documented history of discrimination against non-U.S. citizens directly aligns with the treatment Plaintiff Rojas endured. Defendants have a pattern of targeting immigrant workers, subjecting them to additional obstacles, degrading remarks, and a lack of fundamental workplace support. Their actions reflect a systemic disregard for anti-discrimination laws, contributing to a toxic and unlawful work environment.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS TO THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (EEOC)**

98. On November 26, 2024, Defendants submitted their response to the Charge of Discrimination filed with the EEOC under Charge No. 520-2025-00083.

99. Upon reviewing Defendants position statement, there are significant discrepancies and misrepresentations emerge concerning the accommodation process, Mr. Rojas' ability to navigate the FMLA procedure, and the company's awareness of his limited English proficiency. (Ex. 6 2024.11.26_Defendant's position in the EEOC_)

100. Defendant LNK was fully aware of Mr. Rojas' limited English proficiency throughout his employment. The company routinely relied on bilingual employees, such as Michael, to communicate work instructions, facilitate meetings, and translate key workplace information. The assertion that Mr. Rojas was expected to complete FMLA forms without assistance disregards the company's prior acknowledgment of his language limitations.

101. The claim that Mr. Rojas navigated the FMLA process without difficulty during his first request for leave is inaccurate. In reality, Defendant LNK's Human Resources department merely instructed him to provide the forms to his physician and did not require him to personally complete any sections. When he later sought leave again in December 2023, the process was unclear, and he was not provided with guidance on deadlines or required documentation.

102. Additionally, Defendant LNK misrepresents its ability to provide reasonable accommodations. Mr. Rojas' severe back condition, documented as early as March 2023, was well known to his supervisor and coworkers. Despite this, LNK failed to explore meaningful accommodations when he initially requested them in July 2023.

103. Notably, in September 2023, Defendant LNK temporarily reassigned Mr. Rojas to the packing department, where he was not required to lift heavy objects. This reassignment demonstrates that a reasonable accommodation was indeed possible, contradicting Defendant LNK's claim that no such position existed. The company's decision to return Mr. Rojas to a physically demanding role after only two weeks further highlights its failure to engage in the required interactive process under the ADA.

104. Defendant LNK also alleges that Mr. Rojas voluntarily failed to complete FMLA paperwork and took unauthorized leave, which led to his termination. However, records show that on November 13, 2023, Mr. Rojas was not the one who initiated his leave. Instead, Human Resources sent him home with the assurance that the company would contact him regarding next steps. Defendant LNK's failure to provide clarity on his employment status created confusion, and their assertion that he abandoned his job is misleading.

105. The shifting and contradictory explanations provided by Defendant LNK regarding Mr. Rojas' termination underscore a pattern of post-hoc rationalization rather than a legitimate business decision. Initially, Defendant LNK stated that Rojas was terminated for failing to submit FMLA paperwork. However, in their EEOC response, they further suggested that he was dismissed due to an inability to perform essential job functions despite the company previously accommodating him.

106. The inconsistencies in Defendant LNK's justification for Mr. Rojas' termination reflect an effort to obscure the true reason for his dismissal: his ongoing requests for accommodations and medical leave. Defendant LNK's failure to accommodate Mr. Rojas, its lack of clear

communication regarding FMLA procedures, and its contradictory explanations for termination indicate a pretextual rationale for what was, in reality, a discriminatory and retaliatory act.

107. The only reasonable conclusion, given Defendant LNK's series of conflicting justifications, is that Mr. Rojas' termination was a retaliatory act prompted by his disability-related accommodation requests and his need for protected medical leave. Defendant LNK intentionally sought to create barriers to his FMLA eligibility, failed to engage in the ADA's required interactive process, and ultimately terminated him under misleading pretenses to avoid providing the legally mandated accommodations and leave.

## FIRST CAUSE OF ACTION
### (Discrimination)
Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.

108. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

109. As set forth herein, the Defendant took an adverse employment action against the Plaintiff based on the protected characteristic of disability.

110. Under the Americans with Disabilities Act, the Plaintiff was entitled to remain free from discriminatory adverse employment practices based on the protected characteristic of disability.

111. Plaintiff suffered harm because of the Defendant's unlawful discriminatory conduct as set forth herein.

## SECOND CAUSE OF ACTION
### (Discrimination)
Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII)

112. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

113. As set forth herein, Defendant took an adverse employment action against Plaintiff based on the protected characteristic of disability.

114. Under Title VII, the Plaintiff was entitled to remain free from discriminatory adverse employment practices based on the protected characteristic of disability.

115. Plaintiff suffered harm because of the Defendant's unlawful, unlawful discriminatory conduct as set forth herein.

## THIRD CAUSE OF ACTION
(Discrimination)
New York Exec. Law §296 et. seq.

116. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

117. As set forth herein, the Defendant took an adverse employment action against the Plaintiff based on the protected characteristic of disability.

118. Under the New York Human Rights Law, the Plaintiff was entitled to remain free from discriminatory adverse employment practices based on the protected characteristic of disability.

119. Plaintiff suffered harm because of the Defendant's unlawful, unlawful discriminatory conduct as set forth herein.

## FOURTH CAUSE OF ACTION
(Discrimination)
Title 8 of the Administrative Code of the City of New York

120. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

121. As set forth herein, the Defendant took an adverse employment action against the Plaintiff based on the protected characteristic of disability.

122. Under the NYCHRL, the Plaintiff was entitled to remain free from discriminatory adverse employment practices based on the protected characteristic of disability.

123. Plaintiff suffered harm because of the Defendant's unlawful, unlawful discriminatory conduct as set forth herein.

## FIFTH CAUSE OF ACTION
(Failure to Accommodate)
Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.

124. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

125. As set forth herein, the Defendant unlawfully failed to accommodate the Plaintiff´s disability.

126. Under the Americans with Disabilities Act, the Plaintiff was entitled to reasonable accommodation.

127. The Defendant took an adverse employment action against the Plaintiff when the Defendant failed to accommodate the Plaintiff´s disability.

128. Plaintiff suffered harm because of the Defendant's unlawful discriminatory conduct as set forth herein.

**SIXTH CAUSE OF ACTION**
(Failure to Accommodate- Title VII)
Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII)

129. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

130. As set forth herein, Defendant failed to accommodate the Plaintiff´s disability.

131. Under Title VII, the Plaintiff was entitled to receive a reasonable workplace accommodation.

132. Plaintiff suffered harm because of Defendant's unlawful discriminatory conduct as set forth herein.

**SEVENTH CAUSE OF ACTION**
(Failure to Accommodate)
Title 8 of the Administrative Code of the City of New York

133. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

134. As set forth herein, the Defendant unlawfully failed to accommodate Plaintiff´s disability. Under the New York City Human Rights Law, the Plaintiff was entitled to a reasonable accommodation in connection with the protected characteristic of disability.

135. The Defendant took an adverse employment action against Plaintiff when the Defendant failed to accommodate Plaintiff as set forth herein.

136. Plaintiff suffered harm because of the Defendant's unlawful discriminatory conduct as set forth herein.

**EIGHT CAUSE OF ACTION**
(Failure to Accommodate)
New York Exec. Law §296 et. seq.

137. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

138. The Defendant unlawfully failed to accommodate the Plaintiff protected characteristic of disability

139. Under the New York Human Rights Law, the Plaintiff was entitled to remain free from discriminatory adverse employment practices based on the protected characteristic of disability.

140. The Defendant took an adverse employment action against the Plaintiff when the Defendant failed to accommodate the Plaintiff

141. Plaintiff suffered harm because of the Defendant's unlawful discriminatory conduct as set forth herein.

## NINTH CAUSE OF ACTION
(FMLA Discrimination) (29 U.S.C.A. § 2615)

142. All allegations are hereby repealed, re-alleged, and incorporated every allegation as though fully set forth herein.

143. The FMLA covered the Defendant and protected the Plaintiff.

144. Under the FMLA, it is unlawful for an employer to retaliate against an employee for exercising their rights, which are protected under the FMLA.

145. Plaintiff exercised his rights under the FMLA when he notified the Defendant of his medical condition and needed accommodation.

146. The Defendant discriminated against and retaliated against the Plaintiff when they did not assist him in completing the FMLA process, did not provide the FMLA forms in Spanish, and terminated his employment for requesting accommodations.

147. Plaintiff suffered harm because the Defendant denied the rights afforded under the FMLA.

## TENTH CAUSE OF ACTION
(FMLA 29 U.S.C § 2615(a)(1))
(FMLA Interference with the Exercise of Rights)

148. All allegations are hereby repealed, re-alleged, and incorporated every allegation as though fully set forth herein.

149. The FMLA covered the Defendant and protected the Plaintiff.

150. Defendant interfered with, restrained, and denied the Plaintiff the substantive rights afforded by the FMLA and supporting regulations.

151. Defendant knowingly and willfully denied Plaintiff the substantive rights of the FMLA as described herein.

152. Under FMLA §105(a)(1), it is unlawful for an employer to interfere with, restrain, or deny an employee in exercising the rights under the FMLA.

153. Plaintiff suffered harm because the Defendant denied the rights afforded under the FMLA.

## ELEVENTH CAUSE OF ACTION
(Aider & Abbettor Discrimination)
New York State Human Rights Law)

154. All allegations are hereby repealed, re-alleged, and incorporated every allegation as though fully set forth herein.

155. Defendant Mollica, in his role as CEO, was responsible for overseeing the policies and practices of the department and ensuring compliance with the New York City Human Rights Law (NYCHRL), including its provisions prohibiting discrimination, harassment, and retaliation in the workplace. Despite holding this leadership position, Defendant Mollica, failed to act to prevent or remedy the unlawful conduct that Plaintiff was subjected to during her employment.

156. Under NYCHRL, it is unlawful for any person to aid, abet, incite, compel, or coerce the doing of any act forbidden under this chapter, or to attempt to do so. Defendant Mollica, through his inaction and failure to intervene, aided and abetted the discriminatory, harassing, and retaliatory actions committed against Plaintiff.

157. As CEO, Defendant Mollica had the authority and responsibility to enforce policies and take appropriate action to prevent unlawful employment practices under the NYCHRL.

158. Despite Plaintiff's attempts to raise his concerns, Defendant Mollica failed to take any meaningful steps to address the hostile work environment and disability discrimination. This failure to act constitutes a violation of the NYCHRL, as Defendant Mollica by his inaction, aided and abetted the hostile work environment and disability discrimination.

159. As a result of Defendant Mollica's willful neglect and aiding and abetting of discriminatory acts, Plaintiff suffered significant emotional distress, loss of employment, and other damages. Defendant Padilla´s actions directly contributed to the adverse employment actions taken against Plaintiff, including the continuation of the hostile work environment and Plaintiff's termination.

## TWELFTH CAUSE OF ACTION
(Aider & Abbettor Discrimination)
New York City Human Rights Law (NYCHRL, N.Y.C. Admin. Code § 8-107)

160. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

161. Defendant Mollica, in his role as CEO, was responsible for overseeing the policies and practices of the department and ensuring compliance Title 8 of the Administrative Code of the City of New York, including its provisions prohibiting discrimination, harassment, and retaliation in the workplace. Despite holding this leadership position, Defendant Mollica, failed to act to prevent or remedy the unlawful conduct that Plaintiff was subjected to during his employment.

162. Under Title 8 of the Administrative Code of the City of New York, it is unlawful for any person to aid, abet, incite, compel, or coerce the doing of any act forbidden under this chapter, or to attempt to do so. Defendant Mollica, through his inaction and failure to intervene, aided and abetted the discriminatory, harassing, and retaliatory actions committed against Plaintiff.

163. As CEO, Defendant Mollica had the authority and responsibility to enforce policies and take appropriate action to prevent unlawful employment practices under the Title 8 of the Administrative Code of the City of New York.

164. Despite Plaintiff's attempts to raise his concerns, Defendant Mollica failed to take any meaningful steps to address the hostile work environment and Disability discrimination. This failure to act constitutes a violation of the Title 8 of the Administrative Code of the City of New York, as Defendant Mollica by his inaction, aided and abetted the hostile work environment and the and Disability discrimination.

165. As a result of Defendant Mollica's willful neglect and aiding and abetting of discriminatory acts, Plaintiff suffered significant emotional distress, loss of employment, and other damages. Defendant Mollica´s actions directly contributed to the adverse employment actions taken against Plaintiff, including the continuation of the hostile work environment and Plaintiff's termination.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Fed. R. Civ. P., Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff seeks all available remedies under all causes of action

listed herein in this Complaint and any and all remedies that the Court deems just and proper. Including but not limited to All lost wages and benefits, front pay, pre judgment and post judgment interest, liquidated damages, punitive damages, statutory penalties, emotional distress damages; recovery of reasonable costs, attorney fees, and expenses; equitable relief, and any other relief considered just and proper.

Dated:  White Plains, New York
         March 11, 2025

EL-HAG & ASSOCIATES, P.C

*Jordan El-Hag*

**Jordan El-Hag, Esq.**
**Attorney for Plaintiff**
777 Westchester Ave, Suite 101
White Plains, N.Y, 10604
(914) 218-6190 (p)
(914) 206-4176 (f)
Jordan@elhaglaw.com
www.elhaglaw.com